**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

BANCROFT LIFE & CASUALTY,
ICC, LTD.,

              Plaintiff,

              v.

ERWIN LO, M.D. and SUE JIN YU, M.D.,

              Defendants.

12cv1431

**ELECTRONICALLY FILED**

**MEMORANDUM OPINION**

In its simplest form, this breach of contract case and declaratory judgment action was brought by Plaintiff, Bancroft Life & Casualty, ICC, Ltd. ("Bancroft"), against two individual Defendants, Drs. Lo and Yu.  Bancroft seeks damages for the breach and declarations that the individual Defendants defaulted on personal Guarantee Agreements related to loans which Bancroft made to SJYEL Ventures, LP ("SJYEL Ventures"), a corporate entity which the individual Defendants essentially own.

However, Defendants contend that this case is not that simple.  Defendants explain that they had a relationship with Bancroft – which began sometime in 2002 or 2003 – through SJYEL Ventures which was a participant in "the Bancroft Program" which – again, in its simplest form – enables companies to obtain, *inter alia,* offshore business risk insurance through Bancroft. Defendants further explain that they entered into several agreements from 2003 to 2010 with Bancroft – at times on their own behalf, and at other times, in their capacity as representatives of SJYEL Ventures.  The individual Defendants, through their Answer, Affirmative Defenses, and Counterclaims to Bancroft's Complaint, essentially contend that the personal Guarantee Agreements at issue in Bancroft's case-in-chief are derivative (or inextricably related) to other

agreements between Bancroft and Defendants and/or SJYEL Ventures, and submit that the Guarantee Agreements must be viewed in the totality of "the Bancroft Program" and its related documentation.

More specifically, Defendants' Counterclaims allege, among other things, that the individual Defendants were defrauded by Bancroft into participating in "the Bancroft Program" on SJYEL Ventures' behalf and/or signing the personal Guarantee Agreements. Defendants claim that participation in "the Bancroft Program" was a prerequisite to obtaining business risk insurance for SJYEL Ventures through Bancroft, and that their participation in "the Bancroft Program," as individuals as well as through SJYEL Ventures, caused them to enter into various agreements over several years. Defendants conclude that the alleged fraud, the breach of a fiduciary duty, and the misrepresentations perpetrated by Bancroft induced them to participate in "the Bancroft Program" and/or enter into various agreements, and thereby renders some, if not all, of the contracts illegal, unenforceable, and/or entitles them to declaratory judgment, rescission of the contracts, and/or damages.

Currently, before the Court is Bancroft's Motion for Partial Summary Judgment on some of Defendants' Counterclaims and Affirmative Defenses.[1] Doc. no. 120. Defendants filed a Response to the Motion for Partial Summary Judgment (doc. no. 133), and Bancroft filed a Reply Brief. Doc. no. 147. The issues are now ripe for adjudication.

---

[1] Bancroft previously made a similar Motion (doc. no. 25); however, the prior Motion was made before discovery had been completed. The Court denied that first request. Doc. no. 33.

# I. STANDARD OF REVIEW

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir. 1994). Disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

A party moving for summary judgment has the initial burden of supporting its assertion that fact(s) cannot be genuinely disputed by citing to particular parts of materials in the record – *i.e.*, depositions, documents, affidavits, stipulations, or other materials – or by showing that: (1) the materials cited by the non-moving party do not establish the presence of a genuine dispute, or (2) that the non-moving party cannot produce admissible evidence to support its fact(s). Fed.R.Civ.P. 56(c)(1).

Conversely, in order to defeat a motion for summary judgment, the non-moving party must support its assertion that fact(s) are genuinely disputed by citing to particular parts of materials in the record, or by showing that: (1) the materials cited by the moving party do not establish the absence of a genuine dispute, or (2) the moving party cannot produce admissible evidence to support its fact(s). *Id.*

In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## II. RELEVANT FACTS

The following facts are material, relevant, and not in dispute, unless otherwise indicated.[2]

The individual Defendants, Drs. Lo and Yu, are medical doctors who live and maintain a medical practice in Texas. ¶ 2.

Sue Ann Ma is a Texas-based CPA and financial planner, who has been a personal friend of the individual Defendants and who, in late 2002, referred the individual Defendants to a Texas attorney, Loren Cook, for the creation of a family limited partnership for asset protection purposes. ¶¶ 28, 29, 34. On December 31, 2002, Cook organized SJYEL Ventures (a Texas Limited Partnership) and SJYEL, Inc. (a Texas Corporation). ¶ 35. Drs. Lo and Yu are the sole shareholders of SJYEL, Inc., and SJYEL Inc. is the general partner of SJYEL Ventures. ¶ 36.

Bancroft Property & Casualty, Ltd. was first formed in the British Virgin Islands on May 1, 2003; and Bancroft Life & Casualty, ICC, Ltd. (the Plaintiff, "Bancroft") was organized on May 1, 2003, was licensed on May 26, 2003, and issued its first "Group Master Policy" on June 11, 2003.[3] ¶ 3. Since 2003, Bancroft offered, among other things, insurance coverage to members of its Premium Lite Program, hereinafter "the Bancroft Program." ¶ 7. To become a

---

[2] Unless otherwise indicated, all facts set forth in this Section, "II. Relevant Facts," were taken from the parties' Joint Statement of Material Facts (doc. no. 143), and thus, the Court's reference to paragraph numbers corresponds to the enumerated paragraphs in that document (doc. no. 143).

[3] Defendants contend that this Group Master Policy was not signed by Bancroft's agent, Belmont Insurance Management, Ltd., on Bancroft's behalf, until "well after" June 11, 2003. ¶ 13.

member and thus participate in the Bancroft Program and obtain insurance through Bancroft, an "interested party" was first required to be a member of the Association Benefits Group, Inc. ("ABG") – a Delaware-based "professional association" wholly owned by Bob Barros (through other corporate entities he owns). ¶¶ 8-9. Barros is a "director" of Bancroft and has at least some ownership interest in Bancroft. ¶ 9.

In late 2002 or early 2003, Sue Ann Ma, was – at a minimum – instrumental, in raising the individual Defendants' awareness of an insurance program known as "Refund Plus" belonging to Boston Life & Annuity, Ltd. – another offshore insurer. ¶ 37-38. Bancroft claims that the "Refund Plus" plan was also sponsored by ABG. ¶ 38. In late December 2002, or early January 2003, Defendant Lo signed an application for the "Refund Plus" plan and on December 31, 2002, he issued a $100,000.00 check (payable to ABG) for the insurance premium. The check was drawn from Defendant Lo's and Defendant Yu's (his wife) joint personal checking account.[4] ¶ 39-40. This check was delivered to Cook who, in turn, delivered it to ABG. ¶ 40.

Following this first premium payment made by the individual Defendants, all remaining premium payments made through 2010 were paid by SJYEL Ventures, with one other exception – a December 30, 2005, premium payment, which was paid by the LoYu Family Partnership, L.P. ¶ 43.

The "Loan Documents" at issue in Bancroft's case-in-chief are comprised of two loan agreements signed by SJYEL Ventures, two Secured Promissory Notes signed by SJYEL Ventures, two Security Agreements signed by SJYEL Ventures, an Agreement for Subordination

---

[4] The individual Defendants contend that they have adduced testimony from Barros that: (1) this premium payment was never sent by ABG to Boston Life, (2) Defendants had no insurance coverage (despite the December 31, 2002, $100,000.00 premium payment) for several months in early 2003, (3) no application was ever completed by the individual Defendants for a Bancroft policy, and (4) Defendants were, at some point time, led to believe that the insurer's entity name had changed from Boston Life to Bancroft. ¶ 39. Defendants also contend that there is corroborating testimony on some of these points. ¶ 39.

of Rights to Payment and Set-Off (hereinafter the "Subordination Agreement"), a Consent to Amendment of Certificate of Insurance, and two agreements for Guarantee of Loan signed by Drs. Lo and Yu in their individual capacity (hereinafter, "the Personal Guarantees"). ¶ 7, fn. 2.

Any additional relevant facts, controverted or not, will be set forth in the appropriate "Discussion" subsections below.


## III. DISCUSSION

### A. Introduction

As an initial matter, Bancroft's Motion for Partial Summary Judgment requests that this Court dismiss five of Defendants' Counterclaims: fraud, illegality, breach of fiduciary duty, conversion, and violation of Pennsylvania's Unfair Trade Practice and Consumer Protection Law 73 Pa.C.S.A. 201-1 *et seq*.  Doc. no. 120.  Bancroft's Motion also requests that this Court dismiss nineteen of Defendants' affirmative defenses, specifically the First, Second, Third, Sixth, Seventh, Eighth, Tenth, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Eighteenth, Nineteenth, Twenty-second, Twenty-third, Twenty-fifth, Twenty-eighth, and Twenty-ninth Affirmative Defenses.  Id.

In their Brief in Opposition to Bancroft's Motion for Partial Summary Judgment, Defendants withdrew their Counterclaim for violations of Pennsylvania's Unfair Trade Practice and Consumer Protection Law (Count IX) and similarly withdrew their Third, Sixth, Eighteenth, Twenty-third, Twenty-eighth, and Twenty-ninth Affirmative Defenses.  Doc. no. 136, fn. 53 (sealed).

Thus, there are four remaining Counterclaims at issue (fraud, illegality, breach of fiduciary duty, and conversion), and thirteen remaining Affirmative Defenses at issue (the First,

Second, Seventh, Eighth, Tenth, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Nineteenth, Twenty-second, and Twenty-fifth).

Based on the remaining Counterclaims and Affirmative Defenses at issue, the Court will grant in part and deny in part Bancroft's Motion for Partial Summary Judgment for the reasons set forth, *infra*.

### B. Specific Counterclaims and Affirmative Defenses at Issue

### 1. Defendants' Fraud Counterclaim (Count I)

Bancroft advances three arguments as to why this Counterclaim should be dismissed. Each argument will be discussed *seriatim*.

### a. Defendants sustained no damages in their individual capacities

Bancroft first argues that Drs. Lo and Yu lack standing to sue Bancroft for fraud because they did not sustain damages in their individual capacities. In essence, Bancroft argues that under the "derivative injury rule," shareholders, such as Drs. Lo and Yu, may not sue for personal injuries that result from injuries to a corporation – even a closely held corporation – such as SJYEL Ventures. *See Kaufman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970) (A stockholder of a corporation does not acquire standing to maintain an action in his own right, as a shareholder, when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares resulting from the impairment of corporate assets.); *see also Pitchford v. PEPI, Inc.,* 531 F.2d 92, 97 (3d Cir. 1975) (holding in an antitrust action that indirect harm that the individual may suffer as a stockholder through injury inflicted upon the corporation may not to be redressed).

The Court recognizes that under Bancroft's application of the derivative injury rule, the individual Defendants are seemingly two steps removed from damages. First, SJYEL Ventures' general partner is SJYEL, Inc. – not the individual Defendants – and second, SJYEL, Inc.'s two shareholders are Drs. Lo and Yu.

However, in *Temp-Way Corp. v. Continental Bank*, 139 B.R. 299, 317 (E.D. Pa. 1992), *aff'd,* 981 F.2d 1248 (3d Cir. 1992), the District Court held that shareholders had standing as individuals to assert claims based on breach of fiduciary duty, breach of oral financing agreement, fraud, and negligent misrepresentation insofar as they sought compensation for damages sustained prior to the time they were stockholders of the corporation. In reaching this conclusion, the District Court noted:

> [W]hile the Third Circuit has not squarely held as such, it is generally accepted that guarantors of a corporation's debt, even if those guarantors are also stockholders, do not have standing to bring an action if the only harm suffered is derivative of the harm the corporation suffered. . . .
> . . .There are several exceptions to the above rule, however. One such exception exists where there is a special duty, such as a contractual duty, between the wrongdoer and the stockholders. This special duty exception applies most often where there is a fiduciary relationship between the wrongdoer and the stockholder. *Cole v. Ford Motor Co.*, 566 F.Supp. 558, 568–69 (W.D. Pa. 1983). Another exception exists where the stockholders suffer an injury separate and distinct from that suffered by the corporation as a result of the wrongdoer's actions. *Id.* Stockholders, similarly, have standing to seek damages in their own right for misrepresentations made to them before they were shareholders for the purpose of inducing their investment.

*Id.*

In addition to *Temp-Way*, in *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 104 (3d Cir. 1986), the United States Court of Appeals for the Third Circuit noted that, "[t]he course of dealing or conduct of the parties can evidence a contractual relationship between parties and thus can confer standing on an individual as a direct party to the agreement." In *Kroblin*, the Court of Appeals agreed with the District Court's finding that the documentary

evidence and conduct of the parties supported a conclusion that the shareholders (Harold Doyle and Dorothy Ortbring) of the Great Lakes Express Company were direct parties to a loan agreement. Specifically, the Court of Appeals held that the District Court correctly concluded that Kroblin directly injured Doyle and Ortbring by refusing to continue payments on the Lakes note, thereby concluding that the shareholders had standing as individuals to sue under the Lakes note.

In *In re Kaplan*, the Court of Appeals for the Third Circuit reiterated that the "derivative injury rule holds that a shareholder (even a shareholder in a closely-held corporation) may not sue for personal injuries that result directly from injuries to the corporation." *Kaplan,* 143 F.3d 807, 811-12 (3d Cir. 1988), citing *Pitchford*, *supra*. The Court of Appeals, while applying Illinois law, next relied upon *Kroblin* for the exception to the rule noting, "[t]he derivative injury rule, however, will not bar Kaplan's claims if he seeks to recover for injuries that were inflicted on him individually rather than on the corporation." 143 F.3d at 812. The Court of Appeals held that because Kaplan signed the agreement at issue in his individual capacity and promised to give the promissee his income tax refund, "the central question with respect to the standing issue concerns the nature of the consideration, if any, that Kaplan himself received in exchange for this personal commitment." *Id*. The Court further explained that if Kaplan received promises in his individual capacity, he could sue for the breach of those promises. *Id*.

In addition to the above, other Courts around the country have held that a shareholder may bring an individual suit if the defendant has violated an independent duty to the shareholder, whether or not the corporation may also bring an action, although damages may be limited so as to avoid a double recovery. *See Lawton v. Nyman*, 327 F.3d 30 (1st Cir. 2003) (applying Rhode Island law); *Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Pa*nel, 20 F.3d

1311 (4th Cir. 1994) (applying North Carolina law); *Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012); *In re Optimal U.S. Litigation*, 813 F. Supp. 2d 351 (S.D. N.Y. 2011), on reconsideration in part, 813 F. Supp. 2d 383 (S.D. N.Y. 2011); *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271 (Mich. 2003); *Tashnek v. Tashnek*, 630 S.W.2d 653 (Tex. App. Houston 1st Dist. 1981); *Bovee v. Lyndonville Sav. Bank & Trust Co.*, 811 A.2d 143 (Vt. 2002).

The Court finds all of the above-cited case law instructive and concludes that Pennsylvania law would support a finding that a shareholder may have standing to sue as an individual where certain, limited exceptions are present such as those described in the cases referenced above.

When deciding whether to dismiss the Fraud Counterclaim[5] brought by Drs. Lo and Yu, the question before the Court is: "Has Bancroft shown that there is no genuine issue of material fact with respect to whether these individual Defendants have standing to sue for fraud?" The Court finds that there are relevant, material facts in dispute, barring the Court from dismissing Defendants' Fraud Counterclaim as a matter of law.

There are two sets of facts which essentially intertwine to create a dispute of material facts necessary to determine whether Defendants Lo and Yu sustained damages as individuals. The first set of facts concerns the timing of: (1) the creation of SJYEL Ventures on December 31, 2002; (2) the payment of the first premium installment of $100,000.00 on December 31, 2002; and (3) the creation of Bancroft, in May of 2003. The second set of facts concerns the nature of the relationships of Bancroft and the individual Defendants to Ma and Cook, as well as the nature of the relationships of Barros to Bancroft, ABG, Ma, and Cook.

As noted in the "Relevant Facts" section (see Section II, above), it is clear and undisputed that the timing of the creation of SJYEL Ventures and SJYEL, Inc. coincides with the first

---

[5] The Breach of Fiduciary Duty Counterclaim will be addressed separately.

premium payment (a payment made by the individual Defendants) for some form of insurance from an offshore insurer. Evidence further demonstrates that Loren Cook, the attorney who provided legal advice to the individual Defendants and simultaneously created the two SJYEL corporate entities on December 31, 2002, for the individual Defendants, received remuneration from Bancroft. Defendants assert that Cook's remuneration and his relationship to Bancroft was not disclosed to them.

Defendants note that Cook testified that he did not consider Drs. Lo and Yu to be his legal "clients" beyond 2002 (presumably December 31, 2002), but Cook was unable to produce a disengagement/withdrawal letter to that effect, and further admitted he did not tell the individual Defendants he was no longer their counsel. Doc. no. 143, ¶ 57. Cook also testified he did not act as Bancroft's counsel at any time, yet he conceded: (1) that he received $700 or $750 in fees or "reimbursement" from Bancroft for any loan documents he drafted for Bancroft, and (2) that Bancroft's Commercial Loan Application form could have given the impression that he was Bancroft's counsel. Id. In addition, Barros testified that ABG paid four and a half percent of every premium dollar paid in respect of the Bancroft Program to an entity that Cook designated. Id., fn 8. Thus, evidence exists which tends to show that the amount of Cook's remuneration appears to have been predicated upon the amount of premium paid by his "law clients," presumably including his 2002 clients, Defendants Lo and Yu.[6]

CPA Ma, who referred Defendants Lo and Yu to Cook, also received some form of remuneration from Cook from 2003 to 2007. In late 2002 or early 2003, Ma (either alone or in addition to Cook) informed the individual Defendants of an insurance program known as "Refund Plus" belonging to Boston Life & Annuity, Ltd. – another offshore insurer. Bancroft claims that the "Refund Plus" plan was also sponsored by ABG.

---

[6] Defendants also contend that Ma received remuneration from Cook. Doc. no. 143, ¶ 57.

It is undisputed that in late December 2002, or early January 2003, Defendant Lo signed an application for the "Refund Plus" plan, and on December 31, 2002, issued a $100,000.00 check (payable to ABG) for the insurance premium payment drawn on Dr. Lo's and his wife's (Defendant Yu's) joint personal checking account. This check was delivered to Cook (presumably on December 31, 2002) who, in turn, delivered it to ABG. Bob Barros, ABG's sole owner, testified that he: (1) did not place the insurance immediately; (2) "held" the premium payment until Bancroft was created; (3) was "director" and had some ownership interest in Bancroft; and (4) ultimately placed the insurance with Bancroft at some point in time in 2003.

The "timing" of the formation of SJYEL corporate entities by attorney Cook – December 31, 2002 – coinciding with the date of the first $100,000.00 premium payment (paid by the individual Defendants) to ABG (whose sole owner, Barros, failed to place the insurance until Bancroft – a company that he, in part, owned – was formed, at a later date), along with the other disputed material facts discussed above, is sufficient for this Court to deny Bancroft's Motion for Summary Judgment with respect to the Fraud Counterclaim. The Court considers this first payment as evidence that the individual Defendants could have been fraudulently induced into "participating" in the Bancroft Program which ultimately led and/or caused them to sign the Guarantee Agreements. As this Court understands the evidence presently before it, the individual Defendants were "advised" by their financial planner, CPA Ma – Defendants' agent or a dual agent – and/or were "advised" by attorney Cook – at a minimum a dual agent, possibly solely Bancroft's agent – to form corporate entities. Once created, SJYEL Ventures could become a member of ABG, and membership in ABG was a prerequisite to obtaining insurance from Bancroft – insurance that would enable the individual Defendants to insure their business risks, protect their assets by deferring the payment of income tax on some of the revenue

generated by their medical practice and/or by "borrowing back" their paid premium, after a period of five years based upon reserve history.[7]

Moreover, because the individual Defendants created their corporate entities through attorney Cook, presumably upon his legal advice, and given that Cook appears to have had simultaneous legal relationships with Bancroft as well as the individual Defendants – Bancroft should not benefit from being able to shield itself behind corporate law strictures, especially those recommended and created by its own lawyer, who may have fraudulently misled Drs. Lo and Yu into believing that he was solely acting on their behalf, by creating the SJYEL corporate entities, and assisting them in delivering their December 31, 2002 premium to ABG. The culmination of these facts renders the Court unable to rule as a matter of law in favor of Bancroft on Defendants' Fraud Counterclaim.

In addition to these facts, Defendants adduced evidence that Bancroft insured SJYEL Ventures against the loss of medical license and/or hospital privileges. SJYEL Ventures did not have a medical license nor hospital privileges to lose – only the individual Defendants did. While this fact does not necessarily make the individual Defendants third-party beneficiaries to the insurance policy issued by Bancroft to SJYEL Ventures, it does further evidence the connectivity among the Bancroft Program, SJYEL Ventures, the individual Defendants, and Bancroft. Evidence has also been produced which shows that Bancroft had separate accounts for each of the individual Defendants. Documentary evidence also exists which tends to show that Bancroft's former administrator considered Drs. Lo and Yu to be insureds along with SJYEL Ventures under the Bancroft policy and/or through the Bancroft Program. Thus, arguably Bancroft's insurance policy may have actually provided some forms of coverage, directly or indirectly, to Drs. Lo and/or Yu, through SJYEL Ventures' policy. This question of material fact

---

[7] The Court recognizes the "five year" period – as that term is defined – may also be in dispute.

also renders the Court unable to rule in Bancroft's favor as a matter of law on the Fraud Counterclaim.

Accordingly, based upon the record, and the disputed material facts outlined above, the Court will allow Defendants' Fraud Counterclaim to proceed to trial. Thus, the Court denies Plaintiff's Motion for Summary Judgment on the Fraud Counterclaim.

### b. Representations about the Guarantee Agreements

Bancroft next contends that it cannot be held liable for fraudulent misrepresentation concerning the personal Guarantee Agreements (specifically, that Defendants would not have to repay SJYEL Ventures' debt), because CPA Ma was not one of Bancroft's agents. Bancroft concludes that if she was not its agent, her representations to Defendants suggesting that Bancroft would never enforce the Guaranty Agreements are not binding on Bancroft. However, as noted in "B.1.a." above, there are several facts which contradict a Bancroft's claim that Ma was not its agent.

CPA Ma admitted to accepting commissions/fees from attorney Cook from 2003 to 2007 because SJYEL Ventures purchased Bancroft insurance. Further, it is undisputed that Ma referred the individual Defendants to Cook, who then created the SJYEL Corporate entities, seemingly for the sole purpose of ultimately purchasing insurance from Bancroft. Ma and/or Cook represented to the individual Defendants that the payment of the insurance premium was purportedly one way that the individuals could defer the payment of income tax on some of the revenue generated by their medical practice – while simultaneously withholding the fact that this premium payment would provide financial benefit to Ma and Cook. Ma misrepresented to the individual Defendants that they would not need to repay the loans made to SJYEL Ventures by Bancroft even though they were signing personal Guarantee Agreements.

Therefore, because there are facts which indicate that Ma may have been, at times, Bancroft's agent and/or at a minimum, a dual agent, and because it is undisputed that she made various purported misrepresentations to the individual Defendants, the Court cannot grant Bancroft's Motion for Summary Judgment on the Fraud Counterclaim.

Furthermore, even if Ma was Defendants' exclusive agent as Bancroft argues, a dispute of material fact exists as to whether Ma was told by Bancroft that Defendants would never have to repay the debt under the Guaranty Agreements. Evidence exists which suggests that that Cook and/or Barros made many representations about the Bancroft Program to Ma over the years. Because Cook was, at a minimum, a dual agent for Bancroft and Defendants, any misrepresentations delivered by Cook (or Barros) to Ma could be construed as misrepresentations made by one of Bancroft's agents to Defendants' agent. Thus, even if the evidence clearly showed that Ma was solely Defendants' agent, which it does not, the Court could not grant Bancroft's Motion for Summary Judgment on Defendants' Fraud Counterclaim, given nature of the representations which were purportedly made to Ma by Cook and/or Barros.

### c. Representations regarding "rolling refund" premium return

Bancroft alleges that the "rolling refund" premium return – monies that were paid by the individual Defendants, and for many years by SJYEL Ventures, as premium – were "refunded" using a formula. Bancroft cites to Drs. Lo and Yu's deposition testimony to support its argument that because the Defendants never understood how this calculation was performed, they could not have relied on it to their detriment.[8]

---

[8] Defendants adduced evidence from CPA Ma supporting their belief that part of the reason they would not have to personally repay the "loans" Bancroft made to SJYEL Ventures in 2010 (despite their signatures on the personal Guarantee Agreements) was because they believed the "loans" (at worst) would be offset against SJYEL Ventures' reserve account and would be deemed "income" to them as individuals. See doc. no. 136, p. 15 (sealed).

As noted above, evidence adduced shows that CPA Ma was possibly Defendants' sole agent, and/or a dual agent of Bancroft and Defendants. Thus, information from CPA Ma regarding the "rolling refund" and other aspects of the Bancroft Program could be construed as coming from Bancroft if a fact-finder is convinced she meets the definition of an agent for Bancroft. However, even if she was solely Defendants' agent, representations made to CPA Ma by Barros (and possibly Cook) concerning the "rolling refund" could then be construed as if the representations were made to Defendants themselves.

In addition, Defendants have adduced evidence through the deposition of Stewart Schwab, a [former] employee of ICMC (Bancroft's former Administrator), suggesting that Bancroft made changes to its refund method but kept these changes "secret" from its insureds until a policy-holder attempted to exit the Bancroft Program. See doc. no. 136, p. 16 (sealed). Moreover, Defendants point to evidence obtained from the deposition of Philip Sigel, Bancroft's controlling Director, who testified that it was his intention to have the Bancroft Program's premium benefit return be on five-year rolling basis, but he admitted that (1) no "five-year rolling" language existed in the Bancroft policy; (2) he sent the policies to attorney Cook, but had no idea as to whether Cook sent the policies to Defendants; and (3) the ABG application which was used to enroll SJYEL Ventures in the Bancroft Program (which was a Boston Life Insurance application, not a Bancroft application) contained a five-year term.

Accordingly, the Court finds that there is substantial evidence which creates a question of material fact as to whether Defendants – either on their own, or through CPA Ma – relied to their detriment on the purportedly false representations concerning the rolling refund premium return benefit. Accordingly, Bancroft's Motion for Partial Summary Judgment of Defendants' Fraud Counterclaim will be denied.

### 2. Defendants' Illegality Counterclaim (Count II) and their Second, Seventh, and Eighth Affirmative Defenses

Bancroft contends that Defendants' Illegality Counterclaim and the related Affirmative Defenses (*i.e.,* the Second – doctrine of illegality, Seventh – violation of Pennsylvania insurance laws, and the Eighth – violation of Texas insurance laws) should be dismissed because neither Pennsylvania nor Texas state law governs the Bancroft Program. Bancroft further argues that even if Pennsylvania or Texas state law applied, neither state's insurance laws would render the Guarantee Agreements (the contracts at issue in Bancroft's case-in-chief) illegal.

In their response to Bancroft's argument, Defendants state "that discovery has revealed evidence that has modified [the] nature [of their illegality Counterclaim]." Doc. no. 136, p. 19 (sealed). Defendants suggest that they "intend to conform their [Illegality Counterclaim] to the evidence at trial . . . and Bancroft will suffer no prejudice." Id. Originally, in their Answer and Counterclaims to Complaint (doc. no. 14), Defendants suggested the Loan Documents (which included the personal Guarantee Agreements) were "tied to and part of a larger insurance scheme, which scheme is illegal and procured by fraud." Doc. no. 14, ¶ 19.

Defendants now claim that "the evidence" shows that Bancroft (through attorney Cook) collected the individual Defendants' premium payment for the purchase of a "Boston Life, Refund Plus" insurance policy in December of 2002. Doc. no. 136, p. 20 (sealed). Defendants further claim the collection of this payment took place in Texas, and although attorney Cook delivered the funds to ABG, ABG did not place the policy with Boston Life, but rather waited until Bancroft was created in May of 2003, and then placed the insurance with Bancroft. Id. Defendants argue that Bancroft (through Cook) accepted a premium in 2002 for an insurance policy that it was not licensed to issue in 2002, and this act contravenes the Texas Insurance

Code.[9] Id. at p. 21 (sealed). Simply put, Defendants argue that this timeline of events evidences the illegal implementation of the Bancroft Program in Texas. Id.

In addition to the Texas law violation, Defendants further argue that the Bancroft Program also violated Pennsylvania insurance laws. Defendants contend that part of their Bancroft "premium" payment was to be used to enroll in modified whole life insurance policies underwritten by American General Insurance ("AIG"). Id. Defendants contend that evidence exists which shows that Barros received a commission from AIG on the placement of the whole life policies with AIG, and this payment constitutes illegal commission splitting in violation of Pennsylvania's Insurance Statues, notably 40 Pa.C.S.A. §372.10.

Thus, Defendants are now taking the position that certain aspects of the Bancroft Program violated the state laws of both Pennsylvania and Texas, thereby deeming those aspects of the Bancroft Program illegal, including the personal Guarantee Agreements.

In its Reply Brief, Bancroft contends that Defendants avoid its argument that the law of the British Virgin Islands and/or St. Lucia would control all documents related to the initial purchase of Bancroft insurance, and further argues that even if the laws of Texas and/or Pennsylvania were to apply, their application would not invalidate the personal Guarantee Agreements which are stand-alone, enforceable contracts.

This Court finds that there are no genuine issues of material fact which a jury must decide. Because Defendants rely solely on Texas and Pennsylvania statutory law for the advancement of their Illegality Counterclaim and related Affirmative Defenses, the Court will solely address those bodies of law as they are most favorable to the Defendants, the non-moving parties.

---

[9] Specifically, Defendants point to *Tex. In. Code Ann.* §§ 101.51 and 101.53(B).

### a. Texas and Pennsylvania substantive law governing illegality claims

Under Texas law, "[a] contract to do a thing which cannot be performed without violation of the law violates public policy and is void." *Villanueva v. Gonzalez*, 123 S.W.3d 461, 464 (Tex.App.-San Antonio 2003, no pet.). The purpose behind this rule is not to protect or punish either party to the contract, but to benefit and protect the public. *Id.* However, a contract that could have been performed in a legal manner will not be declared void, illegal, and unenforceable merely because it may have been performed in an illegal manner or because illegal acts were committed in carrying it out. *Lewis v. Davis*, 199 S.W.2d 16, 149 (Tex. 1947).

Applying Texas substantive law, the United States Court of Appeals for the Fifth Circuit in *In re OCA, Inc.*, noted that Texas law "does allow a severability clause to save a contract that contains illegal provisions," but only when the illegal provision is not "an essential part of the contract." *OCA,* 552 F.3d 413, 423-24 (5th Cir. 2008). Relying on *Williams v. Williams*, 569 S.W. 2d 867, 871 (Tex. 1978), the Court of Appeals in *OCA* further held, "the existence of a severability clause does not guarantee that a contract will always thus be saved from illegality." In reaching this conclusion, the Court of Appeals relied upon both *Williams* and *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715 (5th Cir. 1995), for the proposition that where the subject matter of the contract is legal, but the contract contains an illegal provision, the illegal provision can be severed and the valid portion of the contract enforced, as long as the illegal portions are incidental provisions. In *OCA,* the Court of Appeals found that the illegal portions of the agreement at issue were not simply incidental provisions, and thus upheld the determination of the bankruptcy court's finding that the agreement could not be severed to cure the illegality. 552 F.3d at 424.

Similar to Texas law, under Pennsylvania law, the doctrine of illegality states that a court should not enforce a contract, if either its formation or performance is criminal, tortious, or otherwise opposed to public policy. *Contractor Industries v. Zerr*, 359 A.2d 803, 805 (Pa. Super. 1976), citing *O'Brien v. O'Brien Steel Const. Co.*, 440 Pa. 375, 271 A.2d 254 (Pa. 1970); see also Restatement, Contracts § 512 (1932) (A contract is illegal 'if either its formation or its performance is criminal, tortious, or otherwise opposed to public policy.'). Pennsylvania courts have also held that if an essential term of a contract is deemed illegal, it renders the entire contract unenforceable by either party. *Deibler v. Chas. H. Elliott Co.*, 81 A.2d 557, 560–561 (Pa. 1951) (holding that a bilateral bargain containing both a legal and illegal promise may not be enforced when the illegal portion is the essential consideration for the bargain).

Additionally, when evaluating contract cases under Pennsylvania substantive law, the United States Court of Appeals for the Third Circuit has discussed the applicability of a claim for illegality. In *Spinetti v. Service Corp. Int'l*, the Court of Appeals held that two unconscionable provisions requiring an employer and its employee to pay their own attorney's fees and share the costs of arbitration were severable because "[y]ou don't cut down the trunk of a tree because some of its branches are sickly." *Spinetti,* 324 F.3d 212, 214 (3d Cir. 2003). However, in *Alexander v. Anthony Intern., L.P.,*[10] the Court of Appeals found that the "unconscionability permeates the agreement" such that it "thoroughly taints its central purpose of requiring the arbitration of employment disputes." *Alexander,* 341 F.3d 256, 271 (3d Cir. 2003). The Court of Appeals noted that the "draconian terms" were found throughout the contract unlike the *Spinetti*

---

[10] Although *Alexander* is a case which emanated from the United States District Court for the District of the Virgin Islands, the Court of Appeals specifically noted in comparing it to *Spinetti* that the law of the Virgin Islands does not differ materially from Pennsylvania law with respect to the severance of unenforceable contract provisions. *Alexander*, 341 F.3d at 271 fn 1. The Court specifically noted that both the Virgin Islands and Pennsylvania law rely on the Restatement (First) of Contracts and the Restatement (Second) of Contracts, which recognize that an unenforceable provision may be severed if the unenforceable provisions are not an essential part of the agreement. *Id.*

case where the Court of Appeals confronted "only two illegal provisions" before concluding that, "[y]ou don't cut down the trunk of a tree because some of its branches are sickly." *Id.*, quoting *Spinetti*, 324 F.3d at 214. The Court concluded in *Alexander* that "the cumulative effect of so much illegality prevents us from enforcing the arbitration agreement. Because the sickness has infected the trunk, we must cut down the entire tree." 341 F.3d at 271.

### b. Evidence related to Defendants' Illegality Counterclaim

With the above bodies of state substantive law in mind, this Court now turns to the uncontroverted, relevant facts of this case.

First, it is uncontested that Bancroft was formed in the British Virgin Islands on May 1, 2003, was licensed on May 26, 2003, and issued its first "Group Master Policy" on or after June 11, 2003. It is also uncontested that membership in ABG was a prerequisite to the purchase of Bancroft insurance. Additionally, it is uncontested that the individual Defendants issued a check payable to ABG on December 31, 2002 for the purchase of offshore insurance. Finally, it appears from the record that Defendants believed the offshore insurance program was a way to avoid and/or defer taxes on a portion of their earned medical practice income.

Second, to be clear, the question of whether such "tax avoidance insurance plans" or "programs" are legal, is not in dispute. Rather, Defendants appear to be arguing that because certain "provisions" of the Bancroft Program (*i.e.,* the inability of Bancroft to issue policies prior to May 26, 2003 and/or the dual commissions received by Barros for using a portion of the Bancroft premium to place whole life policies with AIG), renders the entire contractual scheme – *i.e.*, the Bancroft Program – illegal, such that no "provision" can be enforced, including the Guarantee Agreements. Specifically, Defendants point to attorney Cook's acceptance of their premium in Texas, and the subsequent "diversion" of their premium payment from one insurer

(Boston Life) to another insurer (Bancroft), and claim this constitutes an illegal implementation of the Bancroft Program in Texas for nearly a six-month time period when Bancroft was not a licensed insurer.

It is undisputed that Defendants intended to purchase, did purchase, and ultimately received, a very specific insurance product – one that enabled them to insure certain business risks while simultaneously, at a minimum, deferring some of their personal income for tax purposes. It is also undisputed that because Bancroft did not exist until May of 2003, and because ABG placed the insurance with Bancroft not Boston Life, Defendants appear to have been without insurance for about six months following their premium tender.

Importantly, Defendants paid their premium to "ABG" (not "Boston Life" or "Bancroft"). Payment made to this entity, as opposed to a specific insurer, exhibits Defendants' intent and their uncontroverted desire to purchase offshore insurance from whatever entity ABG deemed appropriate. ABG chose Bancroft as the insurer and, despite the fact that Texas statutory law indicates that a non-insurer cannot sell insurance or accept "premium," Bancroft did not do so in 2002. ABG did, and did so upon Defendants' authority.

Thus, the *conduct* of Defendants, as evidenced by the issuance of their personal joint $100,000.00 check payable to "ABG," indicates their desire to have ABG place offshore insurance for them and/or SJYEL Ventures. Defendants intended to purchase, did purchase, and ultimately received, a very specific insurance product – one that enabled them to insure certain business risks while simultaneously, at a minimum, deferring income for tax purposes – albeit a little more than six months later than their "date of purchase." The fact that Defendants thought they were purchasing insurance from one provider (Boston Life) but received it from another offshore insurer (Bancroft), and for a period of time (nearly six months) were actually uninsured,

does not render the Bancroft Program (and by extension, their personal Guarantee Agreements) illegal.

There was a definite meeting of the minds to buy and sell an offshore insurance product that would enable Defendants as the purchasers to obtain business risk insurance while simultaneously deferring some of their income so as to avoid some taxation. The Bancroft Program was a contract (or series of contracts) which achieved Defendants' goal of purchasing, and Bancroft's goal of selling, such a product.

Construing all of the facts in a light most favorable to the Defendants, the Court finds that during the period of time from December 31, 2002 through May 26, 2003, when Bancroft was not licensed as an insurer, and thus, *potentially* in violation of a Texas insurance statute, is the type of situation where an illegal act *may* have been committed in carrying out the over-arching goal of both parties to the contract. Under the Texas case law referenced above, this Court will not deem the entire contract (*i.e.*, the Bancroft Program) and by extension, the personal Guarantee Agreements, illegal.

Similarly, the Court finds that alleged violation of Pennsylvania statutory law by Barros' "commission sharing" would be like cutting down an entire tree because one of the branches was sickly. Even if Barros' receipt of commissions on the AIG whole life policies were illegal under Pennsylvania law, this particular purported "unconscionable" act does not "permeate the agreement" such that it "thoroughly taints" the "central purpose" of the over-arching goal of the Bancroft Program so as to render it, and the purportedly related Guarantee Agreements, illegal under Pennsylvania law.

In addition to the above, Bancroft indicated that other Courts across the United States have determined that a violation of a state's law cannot render the "the Bancroft Program" –

including all of its resultant agreements (which presumably would include agreements akin to the Guarantee Agreements in this case) – illegal, because the Bancroft Program must be construed under the laws of the British Virgin Islands or St. Lucia, depending on the time frame at issue. Doc. no. 121, p. 16, fn 5.

Accordingly, Defendants have failed to adduce evidence sufficient to support their Counterclaim for Illegality of the Bancroft Program, and by extension, the Guarantee Agreements, under either Texas or Pennsylvania law. As such, Bancroft's Motion for Summary Judgment with respect to Defendants' Illegality Counterclaim, as well as Defendants' Second, Seventh, and Eighth Affirmative Defenses, will be granted.

### 3. Dismissal of Breach of Fiduciary Duty Counterclaim (Count III)

#### a. Drs. Lo and Yu lack standing to assert the claim

This argument has been disposed of by the Court's Opinion in "B.1.a.," above. Drs. Lo and Yu have standing. The only remaining question to resolve is whether Bancroft owed them a fiduciary duty.

#### b. Bancroft's duty to Drs. Lo and Yu

Bancroft attempts to distance itself from its relationship with Drs. Lo and Yu, but its own words belie this position. In addition, Bancroft argues that Pennsylvania substantive law supports its argument that Bancroft owed no fiduciary duty to Defendants, because the Guarantee Agreements under which it sued Defendants are to be governed by Pennsylvania law. Defendants likewise rely upon Pennsylvania law to prove a fiduciary duty existed. The Court agrees with Defendants, and will accordingly, deny Bancroft's Motion for Summary Judgment of this Counterclaim.

A "fiduciary relationship," as defined by the United States Court of Appeals for the Third Circuit applying Pennsylvania law, is:

> In general, a confidential relationship, or a fiduciary relationship, the two terms being ordinarily used inter-changeably, within the meaning of the rule that a constructive trust arises from the abuse or violation of such a relationship, exists wherever confidence is reposed on one side and there is a resulting superiority and influence on the other. . . .
>
> The elements of the confidential relationship are thus: (1) a relationship of actual closeness; (2) a substantial disparity in the parties' positions; (3) actual reliance by the settlor on the person in the position of trust.

*Clyde v. Hodge*, 460 F.2d 532, 535 (3d Cir. 1972).

This Court also finds the case of *City of Harrisburg v. Bradford Trust Co*., 621 F.Supp. 463 (M.D. Pa. 1985), instructive. In *Bradford Trust*, the District Court held:

> In general, an omission is actionable only when there is an independent duty to disclose the omitted information. *Staffin v. Greenberg*, 672 F.2d 1196, 1202 (3d Cir.1982). . . . Such an independent duty exists, for example, where the party who is alleged to be under an obligation to disclose stands in a fiduciary relationship to the party seeking disclosure. Chiarella v. United States, 445 U.S. 222, 229–30, 100 S.Ct. 1108, 1115–16, 63 L.Ed.2d 348 (1980); Federal Land Bank of Baltimore v. Fetner, 269 Pa.Super. 455, 410 A.2d 344 (1979), cert. denied, 446 U.S. 918, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980) (Pennsylvania common law requires the existence of a "confidential relationship" as prerequisite to liability for omissions).

621 F.Supp. at 473.

Turning to the facts present in this case, as noted above, attorney Cook testified that he did not consider Drs. Lo and Yu to be his "clients" beyond 2002 (presumably December 31, 2002), but he failed to produce a disengagement/withdrawal letter to that effect, and further admitted he did not tell the individual Defendants that he was no longer their counsel. Doc. no. 143, ¶ 57. Cook also testified he did not act as Bancroft's counsel at any time, yet he conceded: (1) that he received $700 or $750 in fees or "reimbursement" from Bancroft for any loan

documents he drafted for Bancroft; and (2) that Bancroft's Commercial Loan Application form could have given the impression that he was Bancroft's counsel.   In addition, Barros testified that ABG paid four and a half percent of every premium dollar paid in respect of the Bancroft Program to an entity that Cook designated.   Thus, the amount of Cook's remuneration appears to have been predicated upon the amount of premium paid by his "law clients," presumably including his 2002 clients, Defendants Lo and Yu.

Given these uncontroverted, material facts, the Court finds that Defendants had a relationship of actual closeness with attorney Cook who led them to believe he was their attorney, and thus, their agent.   Evidence suggests that Cook failed to disclose to Defendants his relationship and/or remuneration from Bancroft at the time he provided legal advice to Defendants concerning the creation of their corporate entities and the purchase of insurance through ABG and/or the Bancroft Program.   These omissions were a breach of his duty to Defendants, presuming he was a dual agent.

Although Defendants are professionals in the medical industry, Cook had disparate knowledge and thus a disparate position with respect to providing Defendants with legal advice. Defendants sought him out and communicated with him directly and/or through their purported agent, CPA Ma, about the creation of their corporate entities and they tendered their personal $100,000.00 premium payment to Cook – who in turn, delivered it to ABG which eventually placed the insurance with Bancroft.

The record supports the view that Defendants actually relied upon attorney Cook to provide them with legal advice concerning the creation of their corporate entities and the procurement of offshore insurance for those entities and for themselves, indirectly.   Defendants were "advised" by attorney Cook – who, based on the evidence was, at a minimum a dual agent,

possibly solely Bancroft's agent – to form corporate entities to protect their business assets, to pay a $100,000.00 premium to an offshore insurer, thereby enabling them to defer payment of income tax on some of the revenue generated by their medical practice. Additionally, there is evidence that Bancroft, through Cook and/or Barros, represented to Ma (Defendants' agent per Bancroft), that a portion of the paid premium could be "returned" as a "loan back" after five years based upon the reserve history.

Therefore, because of the relationship between the Defendants, who have standing, and attorney Cook, who acted, at a minimum, as dual agent without disclosing his Bancroft relationship to Defendants, the Court will deny Bancroft's Motion for Summary Judgment on the Breach of Fiduciary Counterclaim. The Court will also deny Bancroft's Motion for Summary Judgment on the Breach of Fiduciary Counterclaim given the representations made to CPA Ma (who, according to Bancroft was Defendants' agent) by Bancroft through Barros and/or Cook.

### 4. Dismissal of Conversion Counterclaim (Count VIII)

Defendants asserted two Counterclaims against Bancroft for its purported failure to return the value of Defendants' life insurance policies to Defendants when they exited the Bancroft Program. The first Counterclaim is for Breach of Contract and the second is for Conversion. See doc. no. 14, ¶¶ 51-54 (Breach of Contract related to the value of the life insurance policies) and ¶¶ 55-59 (Conversion related to the value of the life insurance policies).

Bancroft seeks dismissal of only the Conversion Counterclaim, arguing that it violates Pennsylvania's Gist of the Action Doctrine. Defendants' pleading sets forth both a tort claim and breach of contract claim with respect to the value of the life insurance policies.

The Court agrees with Bancroft that Pennsylvania's Gist of the Action doctrine bars Defendants' tort-based, Conversion Counterclaim. As such, the Court will not address Bancroft's other arguments related to the dismissal of the Conversion Counterclaim.

In Pennsylvania, the "gist of the action doctrine[ ] . . . operates to preclude a plaintiff from re-casting ordinary breach of contract claims into tort claims." *Hart v. Arnold*, 884 A.2d 316, 339 (Pa.Super. 2005). The nature of the wrong attributed to the defendant is "the gist of the action, the contract being collateral." *Mirizio v. Joseph*, 4 A.3d 1073, 1080 (Pa.Super. 2010). "The important difference between contract and tort claims is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie from the breach of duties imposed by mutual consensus." *Hart*, 884 A.2d at 339.

In *Hart*, the Court held as follows:

In general, courts are cautious about permitting tort recovery based on contractual breaches. In keeping with this principle, this Court has recognized the "gist of the action" doctrine, which operates to preclude a plaintiff from re-casting ordinary breach of contract claims into tort claims. The conceptual distinction between a breach of contract claim and a tort claim has been explained as follows:

> Although they derive from a common origin, distinct differences between civil actions for tort and contractual breach have been developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals. . . . To permit a promisee to sue his promisor in tort for breaches of contract inter se would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions.

> However, a breach of contract may give rise to an actionable tort where the wrong ascribed to the defendant is the gist of the action, the contract being collateral. The important difference between contract and tort claims is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie from the breach of duties imposed by mutual consensus. In other words, a claim should be limited to a contract claim when the parties' *340obligations are defined by the terms of the contracts,

and not by the larger social policies embodied by the law of torts. *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 581-82 (Pa.Super. 2003), appeal denied, 852 A.2d 313 (Pa. 2004) (quoting *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa.Super. 2002)) (internal citations omitted) (emphasis added).

*Id.* at 339-40.

"Gist" is a term of art in common law pleading that refers to "the essential ground" or object of the action in point of law, without which there would be no cause of action. *Id.* at 240. The "gist of the action" test . . . is a general test concerned with the "essential ground," foundation, or material part of an entire "formal complaint" or lawsuit. *Id.*

Turning to the instant matter, the facts presented by the parties to this Court, suggest that the whole life insurance policies were to be part of the Bancroft Program. According to the Parties' Joint Statement of Undisputed Facts, in April of 2009, the individual Defendants (on behalf of SJYEL Ventures) requested a cancellation of insurance coverage which would provide for lost revenue resulting from the death of a key employee. Doc. no. 143, ¶ 89. In this same request, Defendants also asked that "modified whole life insurance policies be distributed." Id. AIG issued these whole life policies, and in June of 2009, Bancroft executed change of beneficiary forms naming the individual Defendants as the beneficiaries. Id. at ¶ 90. Each of the AIG policies has a cash surrender value that is available to the beneficiary in the event the policy is liquidated. Id. at ¶ 93. In December of 2009, SJYEL Ventures requested reinstatement of the insurance coverage which would provide for lost revenue resulting from the death of a key employee. Id. at ¶ 91. Contemporaneously with the reinstatement of this type of insurance coverage, the individual Defendants executed a change of beneficiary form, naming Bancroft the sole beneficiary, and Bancroft currently is the sole beneficiary of the AIG whole life insurance policies. Id. at ¶ 92.

Defendants contend in their Brief in Opposition to Bancroft's Motion for Summary Judgment on the Conversion Counterclaim that "[f]or the quarter ended June 30, 2009, life insurance charges of $155,750 for each Dr. Lo and Dr. Yu were *refunded* to Bancroft, but [Bancroft] never credited SJYEL [Ventures'] reserve accounts to reverse the original charge for the payments." Doc. no. 136, p. 23, fn 50 (sealed). In addition, Defendants argue that "Bancroft failed to make credits to SJYEL [Ventures'] reserve accounts for the cash surrender value of the life insurance policies subsequent to the time when the ownership of the policies was transferred back to Bancroft by Drs. Lo and Yu." Id., p. 23.

Defendants' own arguments belie the fact that a contract or an agreement existed with Bancroft with respect to what Bancroft was supposed to do with "refunded" life insurance monies (like the $155,750.00 for each of the individual Defendants at the end of June of 2009), and what Bancroft was supposed to do with the cash surrender value of the life insurance policies themselves (*i.e.,* apply the value of the cash surrender value to SJYEL Ventures' reserve account). Given the facts of the case as have been presented to this Court in their totality, and given the uncontested facts that the monetary value of the cash surrender value of AIG's whole life insurance policies was allegedly supposed to flow through Bancroft back to SJYEL Ventures' overall reserve account, presumably for the overall "business risk insurance" it purchased through the Bancroft Program, the Court concludes that Defendants' Conversion Counterclaim is subsumed by their Breach of Contract Counterclaim.

Although Defendants argue that they should be given the opportunity to choose the type of claim they will advance – tort or breach of contract – at time of trial, this Court disagrees that they may do so in light of the uncontroverted facts demonstrating that this claim sounds in contract, given that Defendants are claiming Bancroft breached its duties with respect to the

whole life payouts imposed by their mutual consensus agreement(s) within the Bancroft Program. Accordingly, the Court will grant Bancroft's Motion for Partial Summary Judgment and will dismiss the Defendants' Conversion Counterclaim.

### 5. Dismissal of Various Affirmative Defenses

The last portion of Bancroft's Motion for Partial Summary Judgment asks this Court to dismiss various Affirmative Defenses raised by Defendants due to their purported failure to adduce evidence.

The current Affirmative Defenses, not withdrawn by Defendants (see doc. no. 136, p. 24, fn. 53 (sealed)), and not yet dismissed by the Court in this Opinion, include:

(1) failure to state a claim upon which relief can be granted (First Affirmative Defense);

(2) accord and satisfaction (Tenth Affirmative Defense);

(3) the Guarantee documents violation public policy (Twelfth Affirmative Defense);

(4) ambiguity (Thirteenth Affirmative Defense);

(5) lack of consideration (Fourteenth Affirmative Defense);

(6) mistake (Fifteenth Affirmative Defense);

(7) waiver (Sixteenth Affirmative Defense);

(8) vagueness (Nineteenth Affirmative Defense);

(9) license (Twenty-second Affirmative Defense); and

(10) Bancroft breached the Loan Documents (Twenty-fifth Affirmative Defense).

Of these, only the Fifteenth Affirmative Defense asserting mistake will be dismissed in its entirety.

The "mistake" alleged in Defendants' Counterclaim reads as follows, "[Bancroft's] claims are barred, in whole or in part, by the doctrine of mistake." Doc. no. 14, p. 12.

"Bancroft's claims" relate to Defendants' alleged breach of contract with respect to their personal Guarantee Agreements signed by the individual Defendants. The "doctrine of mistake" has been applied to permit a finding that despite appearances there is no agreement in fact.

Here, Bancroft's breach of contract claims against the individual Defendants are based upon the individual Defendants' personal guarantees to repay funds allegedly "borrowed" by SJYEL Ventures. Defendants have argued (and will likely continue to argue) that they executed the personal Guaranty Agreements because, based upon advice/information received from others, they believed that they would never have to repay SJYEL Ventures' "loans." The evidence adduced shows that it is the advice/information that Defendants purportedly received about the nature of the money that was transferred from Bancroft to SJYEL Ventures in 2010 (*i.e.*, a "loan" versus a "premium refund") that forms the basis for the affirmative defense of "mistake."

However, the documents themselves – which Defendants signed – suggest Defendants were personally guaranteeing Bancroft's loan(s) to SJYEL Ventures. The Court finds that Defendants' failure to read these documents and failure to press their advisor(s)/agent(s)/informer(s) for more information concerning the effect of the documents does not give rise to an affirmative defense under the doctrine of mistake. *See In re Stock Bldg. Supply, LLC,* 433 B.R. 460, 468 (Bkrtcy.D.Del. 2010), citing *Joaquin v. Joaquin*, 698 P.2d 298, 303 (Haw. App. 1985) ("A mistake as to the nature and effect of a document caused by a failure to read it is not an excusable mistake."); *McGregor v. Metro. Life Ins. Co.*, 136 S.W. 889, 890 (Ky. 1911) ("It is well settled that the failure to read does not constitute a mistake.").

Accordingly, Defendants are foreclosed from arguing the doctrine of mistake as an Affirmative Defense to Bancroft's claims.

The remaining affirmative defenses will be preserved for Defendants' use at time of trial. Defendants have adduced evidence which tends to show that the Bancroft Program and the "loans" made to SJYEL Ventures – the subject of Bancroft's case-in-chief – are closely, if not inextricably, interrelated; and thus, the Court concurs with Defendants that those remaining Affirmative Defenses (*i.e.,* vagueness, ambiguity, lack of consideration, accord and satisfaction, violation of public policy, etc.) are appropriately preserved for argument before the jury related to the alleged fraud and/or breach of fiduciary duty and/or their own breach of contract claims against Bancroft. Accordingly, the remaining Affirmative Defenses will not be dismissed.

## IV. CONCLUSION

Bancroft's Motion for Partial Summary Judgment will be granted with respect to the following Counterclaims:

(1) Count II – Illegality;

(2) Count VIII – Conversion; and

(3) Count IX – Violation of Pennsylvania's Unfair Trade Practice and Consumer Protection Law.

Bancroft's Motion for Partial Summary Judgment will also be granted with respect to the following Affirmative Defenses:

(1) Second Affirmative Defense – doctrine of illegality;

(2) Third Affirmative Defense – violations under RICO, 18 U.S.C. §§ 1961-68;

(3) Sixth Affirmative Defense – doctrine of estoppel or equitable estoppel;

(4) Seventh Affirmative Defense – violation of Pennsylvania Insurance Laws;

(5) Eighth Affirmative Defense – violation of Texas Insurance Laws;

(6) Fifteenth Affirmative Defense – doctrine of mistake;

(7) Eighteenth Affirmative Defense – doctrine of *in pari delicto*;

(8) Twenty-third Affirmative Defense – release;

(9) Twenty-eighth Affirmative Defense – violations of Pennsylvania and Texas Securities laws; and

(10) Twenty-ninth Affirmative Defense – failure to join indispensable parties.

Bancroft's Motion for Partial Summary Judgment shall be denied in all other respects. Therefore, the trial of the above-captioned matter will include Bancroft's claims for Breach of Contract (Count I ) and Declaratory Judgment (Count II); and will also include Defendants' Counterclaims for Fraud (Count I), Breach of Fiduciary Duty (Count III), Demand for an Accounting (Count IV), Rescission (Count V), Declaratory Judgment (Count VI),  Breach of Contract – Failure to Return Universal Life Policies' Value (Count VII),  and Violation of Pennsylvania Uniform Commercial Code (Count X), together with the Affirmative Defenses that have not been dismissed as noted immediately above.

An appropriate Order of Court shall follow.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge

cc:    All Registered ECF Counsel and Parties